UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  14-CV-20352-ALTONAGA/SIMONTON

MARIA G. PENA, on behalf of herself and
others similarity situated,

        Plaintiff,

vs.

HANDY WASH, INC., d/b/a INDEPENDENT
DRIVERS       ASSOCIATION,       ZUNI
TRANSPORTATION,   INC.,   and   JORGE
AZOR,

        Defendants.

_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Defendants HANDY WASH, INC., d/b/a INDEPENDENT DRIVERS ASSOCIATION,

ZUNI TRANSPORTATION, INC., and JORGE AZOR, through undersigned counsel and

pursuant to S.D. Fla. Local Rule 7.1, submit their Response in Opposition to Plaintiffs' Motion

for Summary Judgment [DE 129], as follows:

1.    <u>Summary of Response</u>:  Summary judgment must be denied, as the record reveals

disputed issues of material fact as to the "economic realities" factors to be weighed by this Court

in determining whether Plaintiffs were misclassified as independent contractors. Plaintiffs

engage in broad generalizations regarding aspects of the control Defendants exercised,

misplacing the Court's focus on the governmental controls in the tasks performed.  Defendants

dispute Plaintiffs' characterization and present evidence that Defendants did not exert an

employer's control over the manner in which Plaintiffs operated their routes.  Plaintiffs were

truly independent entities who, by agreeing to operate County para-transit routes as

GRUMER & MACALUSO, P.A.
ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

subcontractors for ZUNI, also agreed to adhere to the County, state and federal regulations governing public transport.  Most if not all of the means of control that Plaintiffs point to are not ZUNI-imposed, but are County (and federally) mandated standards that define and regulate the STS system that Plaintiffs knowingly and readily agreed to service.   Plaintiffs are disingenuous in claiming that ZUNI, in meeting its parallel obligations to the County of ensuring safety and compliance, controlled them and their routes; a true examination of the economic realities reveals Plaintiffs' independent contractor status.

Within the established STS para-transit system that Plaintiffs serviced, which had inherent limits, ZUNI went above and beyond in incentivizing the independent drivers and extending freedoms and choices not available to hourly drivers.  Plaintiffs had the ability to (whether exercised or not) utilize their managerial discretion and entrepreneurial skills to maximize profits, and reduce loss and risk.  This Court must conclude there are material issues of fact precluding the summary determination that Plaintiffs were mischaracterized employees. [1]

2.    Disputed Issues of Material Fact Required Denial of Plaintiffs' Motion:  The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991). The court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, summary judgment should not be granted unless the facts are so crystallized that all that remains are issues of law.  *Cook ex rel. Estate of*

---

[1] Defendants concede they did not move for summary judgment on this very issue, acknowledging the disputed issues of fact concerning Plaintiffs' independent contractor/employee status.

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

*Tessier v. Sheriff of Monroe County,* 402 F. 3d 1092, 1120 (11th Cir. 2005). If material issues of fact exist, the Court must not decide them, but rather must deny the motion and proceed to trial.

Summary judgment must be denied as every aspect of Plaintiffs' claims bearing upon the economic realities of their relationships with Defendants is disputed in the record and any reasonable doubts should be resolved in Defendants' favor.

3.      Economic Realities Considerations for Determining Employee v. Independent Contactor Status: "The FLSA does not apply to independent contractors." *Murray v. Playmaker Services, LLC,* 512 F. Supp. 2d 1273, 1276 (S.D. Fla. 2007). "Courts must therefore determine whether one is, as a matter of economic reality, an employee who is afforded the protections of the FLSA, or an independent contractor, who is not." *Id.* (*citing Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728 (1947)). "The test used by courts to determine whether an individual is an independent contractor, rather than an employee, is known as the 'economic realities test.'" *Demauro v. Limo, Inc.,* No. 8:10-cv-413-T-33AEP, 2011 WL 9191, at *3 (M.D. Fla. 2011) (*citing Perdomo v. Ask 4 Realty & Mgmt, Inc.,* 298 F. App' x 820, 821 (11th Cir.2008)). The economic realities test factors include:

(1)     the nature and degree of the defendant's control as to the manner in which the work is performed;
(2)     the plaintiff's opportunity for profit or loss depending on his managerial skill;
(3)     the plaintiff's investment in equipment or materials;
(4)     whether the service rendered requires a special skill;
(5)     the degree of permanency and duration of the working relationship; and
(6)     the extent to which the service rendered is an integral part of the defendant's business.

*Id.* (*Freund v. Hi-Tech Satellite, Inc.,* 185 F. App'x 782, 783 (11th Cir.2006)). No single factor is dispositive and courts must evaluate each individual under the totality of the circumstances. *Id.* (*citing Perdomo,* 298 F. App'x at 821).

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

Although Plaintiffs performed similar work as drivers operating STS paratransit routes, the individualized analysis needed to determine whether each driver is an independent contractor or employee for FLSA purposes precludes consideration of their claims collectively, and Defendants filed a Motion for Decertification of Conditional Class [DE 134], which is pending. *Demauro*, No. 8:10-cv-413-T-33AEP, 2011 WL 9191, at *3 ("Although each Plaintiff and opt in driver have the same position as an ExecuCar driver, the individualized analysis needed to determine whether each driver is an independent contractor or employee for FLSA purposes precludes class certification."); *see also Pfaahler v. Consultants for Architects, Inc.*, No. 99 C 6700, 2000 WL 198888, at *2 (N.D. Ill. 2000) ("In order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with [Defendant]; this inquiry could also entail examining each claimant's relationship with the various corporate clients with whom they were placed by [Defendant]. Where this is the case, certification of a collective action under the FLSA is inappropriate.").

"The economic realities test is fact intensive and requires individualized analysis. Accordingly, a number of courts have determined that whether an individual is an independent contractor or an employee is not appropriate for determination on a class-wide basis." *Demauro* at *9-10. "The need for individualized inquires would contravene the basic theory of judicial economy upon which the certification of collective actions is based." *Id.* at 10 (*citing West v. Verizon*, Case No. 8:08-cv-1325-T-33MAP, 2009 U.S. Dist. LEXIS 82665, at *12 (M.D. Fla. 2009). "This necessarily individualized assessment eviscerates all notions of judicial economy that would otherwise be served by conditional class certification." *Id.* at *4.

Notwithstanding the differences among the Plaintiffs' working relationships with Defendants, the different degrees and ways in which each exercised control over their respective operations requires denial of summary judgment.

### (a) The Nature and Degree of the Defendant's Control as to the Manner in Which the Work is Performed

DEFENDANTS did not control every *meaningful aspect* of the Plaintiffs' work. When considering the nature and degree of control exerted by Defendant, this Court must look to whether Plaintiffs enjoyed independence and exerted control over a meaningful part of their business so as to stand as a separate economic entity. Each of the considerations governing control is so contested and disputed in the record that summary judgment is improper.

Plaintiffs place great weight on the route assignment system, via daily manifests faxed to each independent driver the night before the next day's operations. The County required each driver to complete and return the manifests to ZUNI to demonstrate completion of the route, and Zuni was obligated to forward the manifest to the County to confirm the trip was performed to completion and to facilitate payment. STATEMENT ¶47. These route manifests identified all passengers approved for the various routes, and stated the location and approximate time for pickup, and destination. Plaintiffs' maintain that the designation in the manifest of the time and place of pickup of passengers, and destination, and the inability of the drivers to negotiate fares or deviate from the routes is indicative of DEFENDANTS' control over the manner in which their work was performed. Yet, given that Plaintiffs' subcontracted work consists of operation of the County's scheduled routes, how would Plaintiffs propose to complete the STS routes without being advised of the route?

The manifest is these contractors' "work order" and essentially described and defined the parameters of the assignment that Plaintiffs agreed to and undertook each day, and provided

GRUMER & MACALUSO, P.A.
ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

specifications for the work to the performed.  Every independent contractor who undertakes any assignment must expect to have the assigned defined clearly before proceeding with his work, and in many cases failure to complete the agreed-upon specifications represents a breach of the contractors' agreement.   Plaintiffs' position is disingenuous.  The Eleventh Circuit in *Scantland v. Jeffry Knight, Inc.* 721 F. 3d 1308, 1315 (11th Cir. 2013) acknowledged that meeting clients' specifications and keeping clients informed of job process is consistent with the "usual path" of an independent contractor. That Court referred approvingly to the ruling in *Herman v. Mid-Atlantic Installation Servs.* Inc., 164 F. Supp. 2d 667, 672-72 (D. Md. 2000):

> It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client.  For example, a builder will build a building according to the specifications of an architect.  This does not make the builder an employee.  A painter will paint a house the colors dictated by the homeowner.  That does not make the painter an employee. In short, requiring a contractor to meet the client's technical specifications is not the type of "control" which bestows 'employee' status on the contractor.

Plaintiffs undertook via ZUNI to operate STS routes for Miami Dade County, with the County being the client.  ZUNI is the provider with sub-contract rights to the routes, and the County's route operating standards called for standardization of the public transportation services performed by the providers such as ZUNI and the independent drivers such as Plaintiffs. ZUNI and the Plaintiffs were required to adhere to certain standards of performance, commencing with the completion of defined routes.  It is as improper to claim that ZUNI is the "employer" as it is to assert the County employed Plaintiffs.

Even with the route manifests defining the work parameters, the Plaintiffs enjoyed great freedoms (and inversely, minimal control by ZUNI) that are swept aside in Plaintiffs' motion. Part of that freedom came from the types of routes that ZUNI held out to the independent contractors.   It is undisputed that the routes that ZUNI held out for ticket drivers such as

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

Plaintiffs were the long-term fixed routes that the County had approved and established years before, with the same passengers and destinations, and were mostly restricted to a specific geographic region, and were "routine." STATEMENT ¶6. This enabled the independent drivers to anticipate each day and each week what their respective trip assignments and passengers would be. The routes permitted the Plaintiffs to manage their time more efficiently and maximize work hours. The fixed routes kept unanticipated trips to a minimum, and allowed for these ticket drivers to operate their routes independently, with minimal or no contact with ZUNI or its dispatchers, and no supervision. Id. at ¶43. Plaintiffs did not have to call in or report on a regular basis, and did not have to notify ZUNI of their location during the day. Those occasions that called for contact with ZUNI were to report a "no show," or when Plaintiffs initiated requests that their trips be re-routed or they sought additional passengers. Id. at ¶57.

Also emblematic of the ticket driver's independence is ZUNI's decision to fax them the route manifest each night, further distinguishing them from the hourly drivers, who were obligated to present themselves ZUNI's offices before their shift to pick up their assigned vehicle, pick up their route sheets, and receive special instructions from ZUNI dispatchers. Id. at¶42. The independent drivers kept their vehicles at home, and set on their routes from home, and were not required to come to ZUNI's offices except to drop off completed manifests a couple of times during the week. Often, when their routes ran smoothly, the independent drivers had no reason to have any contact with ZUNI, nor ZUNI with them.

Unlike the hourly drivers who were under the constant control and command of ZUNI's dispatchers through the day as they awaited their next assignment, ZUNI did not control what roads the independent drivers selected to complete their routes, or when to take breaks, and they had the ability to manage their own operations. Id. at ¶43. This was far different from the hourly

drivers, who were being dispatched trips on an *ad hoc* and constant basis during the day, were closely monitored for their present locations, and were not able to reject a trip assignment. Id. at ¶42. The hourly drivers were considered "back up" drivers who were assigned the add-on passengers and those trips that needed to be re-routed from an independent contractor and received constant instruction during the day. Id.

DEFENDANTS did not impose upon any ticket driver the route they would operate. The independent drivers including Plaintiffs selected the type of route they would be operating, whether ambulatory or non-ambulatory, which then influenced the type of vehicle they would be operating, whether a sedan, a bus, or a wheelchair van. Each independent driver had the option to place their own vehicles in service, as several Plaintiffs did, or ZUNI provided the option of leasing vehicles to them, and it was their choice. Their routes varied, as did their vehicles, and their rate of pay, as each Plaintiff selected different types of routes and made different arrangements for vehicles. PENA selected the route she operated, which was for ambulatory passengers in a five passenger sedan that she leased from ZUNI. RAMIREZ opted for an eight passenger wheelchair van for non-ambulatory routes that he leased to own from ZUNI, and by March 2013, had already purchased his first van, and was on his second lease from ZUNI. VALENCIA requested to operate an ambulatory route and immediately made arrangements to secure a vehicle. Id. at¶93.

Unlike employee drivers, the independent drivers were not obligated to complete every trip on their manifest, and could reject any trip provided they communicated this to ZUNI, could work a partial day, or take time off, days off, or weeks off on request for a multitude of reasons, as the record reveals. Id. at ¶43. As the rejected trip had to be re-routed, and passengers could not be left stranded per the County, the independent drivers necessarily were requested to

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

communicate their time off requests to ZUNI as early as practicable to ensure re-routing to a "back up" employee driver.    Many time off requests due to emergencies were accommodated on the same day.  The ticket drivers could also accept or refuse to accept requests for add-on passengers that dispatchers might communicate during the day. Id. at ¶46, 57.

Unlike employee drivers, the independent drivers enjoyed flexibility with the order of passenger pickups.  Due to the regularity of their routes, the independent drivers developed relationships with their passengers, and often communicated with them via cell phone.  PENA sometimes communicated with passengers directly to switch the order of pickups, without involving or notifying ZUNI. PENA, p. 54. VALENCIA regularly altered the order of pickups for his morning passengers to save time and fuel. VALENCIA, p. 53-54.

Plaintiffs and the other ticket drivers could and did build upon their assigned routes by seeking out additional passengers from ZUNI when they had down time, and ZUNI would accommodate these requests when passengers were available in the geographic area. STATEMENT ¶57. Independent drivers could elect to do other things during down time between routed trips, whether personal errands, take a nap, or perform maintenance on their vehicle, with no involvement or objection by ZUNI. Id. at ¶46.   Independent drivers also were free to accept or reject add-on passengers that were sometimes offered to them by ZUNI dispatchers during the day. Id. Ticket drivers often communicated improvements to their route by requesting to switch passengers with other drivers, and ZUNI re-routed the passengers when possible. Id. at ¶57.

ZUNI did not monitor, supervise or discipline the Plaintiffs, who were entrusted to abide by the County performance and safety standards for uniform operations of the routes, and the specific details of how their operated their routes were left up to them.  Id. at 43. These included standards impacting passenger safety, vehicle condition, and standardized policies such as the

"no show" policy and the thirty minute pickup window. There is no testimony that ZUNI "rode along" or followed any Plaintiff along their route, or that imposed any discipline for non-compliance.  Carlos Azor testified he often saw ticket drivers along their routes not wearing the ZUNI uniform shirt, with no consequence to the driver. CAR  PENA testified she was not subject to supervision by ZUNI. PENA, p. 91.  Other Plaintiffs referred only to occasional "spot checks" performed by ZUNI road supervisors at the different centers.  CARLOS AZOR testified that these checks were primarily to ensure staff at the different centers were satisfied that passengers were being transported on time and in a professional manner.  Id. at ¶43. *See Chao v. Westside Drywall, Inc.* 709 F. Supp. 2d 1037, 1064 (D. Or. 2010)(facts that weigh in favor of independent contractor status include the defendants did not control when plaintiffs had to report to work, when to take breaks, when their workday ended, or whether they were free to attend to personal business during the day, and plaintiffs worked without direct supervision most of the time)

Plaintiffs place great emphasis on the County safety requirements that all STS drivers be screened, licensed and uniformly trained, and that ZUNI maintain complete files documenting their eligibility, that they wear a uniform shirt identifying them as STS drivers,  that they carry a Nextel radio for instant communications with ZUNI dispatch when required, that their vehicles be inspected regularly, that their vehicles be marked to identify them as an STS provider, and that ZUNI carry liability insurance for all drivers, which it did.   Like the manifest requirement, these requirements were mandated by the County code, and by federal DOT regulations that also governed the STS program, and ZUNI was legally obligated to follow.  Id. at ¶87. ZUNI had no choice in regards to these functions, and this obligation undercuts any bearing that these facts have on the "control" analysis. *See also Collado v. J. & G. Transport, Inc.*, Case No. 14-80467-

10
GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

CIV-Goodman (S.D. Fla. April 17, 2015 Order).   In *Collado*, the court rejected Plaintiff's argument that Defendants exerted "significant control" over drivers by checking their driving record and immigration status, and subjecting them to a drug test prior to employment, because Defendants performed these duties pursuant to regulations promulgated by the Department of Transportation. "This arguably undercuts any bearing these facts may have on the "control" analysis – Defendants *have* to perform these duties to comply with government regulation." *Id*. at *12 (emphasis in original).

In *Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782 (11th Cir. 2006), the Eleventh Circuit affirmed the district court's summary judgment in favor of the defendant finding that the plaintiff, a home satellite system installer, was an independent contractor.   The district court determined that the defendant exerted little control over the plaintiff, even though he was not allowed to perform any additional services for customers without prior approval, he had to wear a company t-shirt, he had to follow minimum specifications for the installations, and he had to call the company to confirm he had completed the installation and report any problems that had arisen.   "The district court found that Hi-Tech's interest in Freund's work was the end result of customer satisfaction, and not with the day-to-day regulations of his work habits.  *Id*. at 783.

Like the plaintiff in *Freund v. Hi-Tech Satellite, Inc*., Plaintiffs here complain they were not allowed to negotiate different routes directly with the passengers and had to complete the routes approved by the County, had to wear a uniform, had to follow certain minimum specifications and had to document the completion of the routes via the manifest, or and had to communicate any problems encountered along the routes to ZUNI.   Like the defendant in *Freund*, ZUNI did not exert control over Plaintiffs' work habits, hours worked or work methods,

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

and the measures taken that impact upon Plaintiffs' operations were County-driven and necessary to ensure customer satisfaction.

The *Freund* court also acknowledged that the plaintiff was free to perform work for other companies, and could have incorporated his own corporate entity, as other installers had. *Id*. Here, too, Plaintiffs were not bound exclusively to ZUNI and could have completed routes for other providers, even competitors of ZUNI, and could have (as RAMIREZ and other ticket drivers did) formed their own corporate entities. Per their ICA Agreements with HANDY WASH, Plaintiffs could have secured employees or their own subcontractors to perform their routes, provided they were cleared by the County. STATEMENT, ¶88. AZOR testified other ticket drivers did hire employee drivers to handle weekend routes on their behalf, with no objection from ZUNI. DE 40 ¶30.

Plaintiffs lament they could not negotiate fares directly with passengers, yet in this argument ignore that they agreed to operate scheduled routes for the County that are based upon fares established by the County, not ZUNI.

Plaintiffs re-direct this Court's attention away from the dissimilarities between the Plaintiffs varying routes, capital investments, and each's divergent accounts of their working conditions and relationships. Instead, Plaintiffs focus only upon the procedures that were admittedly common to all Plaintiffs, but were mandated by Miami-Dade County, imposed upon Defendants, and it follows, upon these Plaintiffs pursuant to the operative County and federal regulations. These "similarities" are not attributable to ZUNI, do not and should not bear upon the measure of control exerted *by Defendants* on the manner in which Plaintiffs performed their work.

### (b) The Plaintiff's Opportunity for Profit or Loss Depending on His Managerial Skill

GRUMER & MACALUSO, P.A.
ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

The second factor in the economic realities test, whether Plaintiffs opportunity for profit or loss depended on his managerial skill also supports the denial of summary judgment.   There is testimony in the record from AZOR that Plaintiffs managed their own routes, and worked with ZUNI to improve their routes for maximizing their earning potential.   Drivers who were practiced and proficient in completing their routes and "hustled" had the potential to earn more. The Plaintiffs testified about varied ways in which they managed their routes to maximize income, from completing their routes timely to allow for extra trips, transporting additional passengers during down time and when their vehicles had space, switching passengers with other drivers, and saving fuel expense in their selection of roads, performing preventive vehicle maintenance, and switching the order of passenger pickups. Although the Plaintiffs claim they were actually "employees" entitled to overtime, several testified they would not have been satisfied if ZUNI *removed* passengers from the routes, and acknowledged more passengers represented more revenue.  For Plaintiffs to assert that Defendants controlled these aspects of their operations is also disingenuous, as their opportunities for implementing some of these methods were limited only by the "available market," i.e., the availability of passengers for assignment or re-assignment among the routes assigned to ZUNI for completion.  In nearly every case when asked of the Plaintiffs, they responded that ZUNI would always accommodate request for additional passengers or transfers of passengers between routes when possible.

Plaintiffs ignore that another way to maximize earning potential was their selection of the routes themselves, and investment decisions.  Those drivers who placed their own vehicles into service not only bore a greater risk, but also benefited from a greater earning potential due to increased rates per trip.  Similarly, drivers who chose to operate non-ambulatory routes also stood to make more per trip, and effective management presented greater earning potential.

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

### (c)  The Plaintiffs' Investment in Equipment and Materials

The Plaintiffs' respective investments in equipment and materials varied, as set forth in the Motion for Decertification, and there were many variants amongst the Plaintiffs regarding the types of vehicles driven by each and their respective investments.  The Plaintiffs' responsibility for operating expenses varied and all of the Plaintiffs claimed different and expenses for tax purposes.   Plaintiffs either operated their own vehicles, leased to own a vehicle from ZUNI, or simply leased a ZUNI vehicle.  STATEMENT, ¶93.  The vehicles driven were either 5-pasenger sedans for ambulatory passengers, 15-passenger vans for ambulatory passengers, or 8 passenger vans for non-ambulatory and ambulatory passengers, and the types of passengers and capacity dictated their respective trip rates and income capacity, and flexibility. Id. Non-ambulatory passengers trips paid more than ambulatory, and those with their own vehicles enjoyed the highest rates.   RAMIREZ leased to own and ultimately purchased a 15-passenger van from ZUNI (a significant investment), and then leased to own a second van through his corporation. IRAMIREZ, pp. 78-79, 110.   VALENCIA purchased and placed into service his own 8-passenger Toyota Siena van for ambulatory passengers.  VALENCIA, p. 27, 33.  ALFONSO, DELGADO and MARIO HERNANDEZ also owned their own vehicles.  Like RAMIREZ, GARCIA and SOCORRO leased to own vehicles from ZUNI, and like RAMIREZ,  GARCIA and SOCORRO also invested in 15-passenger vans.   PENA, CARRIEL, LABRADA and all of the other Plaintiffs paid for the use of ZUNI vehicles with the cost reflected in the lower per trip compensation  or  were charged for vehicle use.   PENA and LABRADA drove 5-passenger sedans, while CARRIEL drove a 15-passenger bus for ambulatory passengers.  PENA, pp. 37-38; LABRADA, p. 19, 48; CARRIEL, pp. 28-29.

All the contract drivers absorbed operational expenses, consisting of fuel, tolls, vehicle

14
GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

repair and maintenance, to varying degrees.    Without exception all drivers paid for fuel and tolls, and routine maintenance such a oil changes, tires and brakes.   Employees did not.

Investments and expenses extended beyond vehicles and maintenance for some drivers. BERNALES claimed as operating expenses his uniform, cell phone, tolls and cleaning products, and everything related to his work, including "pants, socks and boots," and in 2012 claimed approximately $39,000 in business expenses. STATEMENT, ¶94.   Through his corporation, Hugo's Drivers Corp., RAMIREZ claimed for tax purposes the expenses of an office set up at his residence which he testified was used *exclusively* for business purposes, and claimed the business paid him rent for the office space.   Id. Through his company, RAMIREZ paid himself income. Id. PENA claimed expenses associated for credit card interest, but paid none of her business expenses with a credit card.  Id.   Without exception, all Plaintiffs claimed significant business related investments and expenses in connection with their routes, and cannot back away from the documented expenses so readily.  The substantial investments and expenses borne by Plaintiffs are of a type not notmally borne by employees, and indicates their contractor status.  *See Herman v. Mid-Atl. Installations Servs, Inc*., 164 F. Supp. 2d at 675.

The only operating expenses borne by ZUNI *in connection with Plaintiffs' operations* were the Nextel radios issued to each driver, the uniform shirts, and at least initially, the cost of liability insurance.  The insurance cost and vehicle expense for those vehicles leased to the drivers was ultimately passed to the drivers as reflected in their per trip rates.   ZUNI's relative investment in the remaining infrastructure, such as mechanic shop, routing and dispatching staff as it applied to the ticket drivers was not significant, as the investments were necessary to keep afloat the routing operations of the employee drivers who completed approximately half of ZUNI's routes and whose trips were not pre-routed, but were routed and dispatched each day.

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

Notwithstanding the varying investments by the Plaintiffs, at bottom is the fact that each absorbed the significant expense associated with purchasing or leasing a vehicle, and several invested in specialized vans, to place into service, and (except for the Nextel radio and uniform shirt), absorbed all operational costs of running their respective routes, and this factor requires denial of Plaintiffs' Motion.

### (d) Whether the Service Rendered Required a Special Skill

In their Motion and throughout this case, Plaintiffs downplayed the level of skill and training required to operate an STS para-transit route.  In the Motion, Plaintiffs equate their driving obligations to that of a laundry delivery person, or drivers of "ordinary passenger vehicles."   The reality is far from this, as prior to coming to ZUNI or being approved by the County for their Hack license for this type of specialized work, all drivers must possess a CDL (or "chauffer's license") and then undergo an extensive screening, road training, sensitivity training, and testing module as explained by AZOR in his deposition.  STATEMENT ¶30, 41.  AZOR repeatedly refers to these drivers as professionals, as they must adhere to dozens of safety and passenger transport protocols not present for regular passengers.  See *Collado v. J. & G. Transport. Inc., supra*, at \*12-13 (possession of CDL – class A license reflects special skill required for truck driving, and cuts against employee status).

To downplay the daily demands imposed upon Plaintiffs is to ignore the nature of and demands imposed by the STS para-transit system.   On a daily basis, Plaintiffs operated wheelchair vans and non-ambulatory passengers, or ambulatory passengers who were blind, elderly or otherwise disabled, dialysis patients, and kids and young adults with autism and other cognitive disorders who were transported to educational and rehabilitation centers, and others who qualified for the STS program.  Plaintiffs were required to follow all STS and DOT

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

regulations for special passenger transport, and undergo annual refresher training.  Although the transportation of special needs, disabled or elderly passengers might have become a matter of routine for these Plaintiffs, the safe and efficient transportation special needs passengers requires specialized training and learned skills.

### (e)  The Degree of Permanency and Duration of the Working Relationship

None of the Plaintiffs were obligated to remain as contract drivers for ZUNI, and were not contractually bound to any specific term for rendition of services under the IC Agreement. PENA and VALENCIA ceased operations without notice after learning that ZUNI was losing the County contract in March 2013.   Admittedly several Plaintiffs operated ticket routes for many years, but this fact alone does not establish an employee relationship.  See *Collado v. J. & G. Transport. Inc., supra*, at *13 (some drivers consistently drove for Defendants for 13-18 years, but other drivers appeared to "come and go," precluding entry of summary judgment in FLSA misclassification case)

The Plaintiffs testified differently regarding how they came to drive under contract for ZUNI and why they remained, and the varying levels of permanency.  Several of the drivers commenced their relationship with ZUNI as hourly employee drivers, and were extended the opportunity to increase their pay and become independent drivers under contract.  Others such as CARRIEL requested to be switched from ticket work to hourly work and back, and RICARDO LIMA-KELLY and DANILO HOYOS were employed as hourly drivers during their final months with ZUNI.

Recognizing that many drivers switched between hourly and ticket work, Plaintiffs paint with a broad brush, and claim generally that the operations of the hourly drivers and independent drivers were the same, which is disputed in the record.  Although all operated STS routes, the

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

records disclosed many differences – as to the type of route, the investment by the driver, lack of discretion of employee driver, and the significant control exerted by ZUNI over the employees.

### (f) Other Factors

Plaintiffs rely heavily on ZUNI's provision of health insurance for all drivers, including Plaintiffs as independent contractors, and ignore that ZUNI's reasons for doing so are also tied to the STS Contract requirements and the County's Living Wage Ordinance.  Per the County Code, and as set forth in Section 73.0 of the STS Contract, providers were incentivized to provide health benefits in the calculation of the living wage, which was authorized at a lesser rate when health benefits were present.  ZUNI adhered to the County's Living Wage requirement with the health benefit included, and monitored every driver's work hours and pay regularly to ensure compliance.

Contrary to Plaintiffs' contention at page 8, ZUNI did not provide any driver with a cell phone, and their use of a cell phone was optional and left to their discretion.

It is undisputed that ZUNI did not pay for any of the independent driver's leave or vacation time, or time off, nor provided retirement or other fringe benefits.   Nor did ZUNI include these independent drivers as part of their workers compensation insurance, covering only the employee drivers.

Plaintiffs disingenuously point to Miami Dade County's Living Wage Ordinance as proof of a *de facto* admission by Defendants that the ticket drivers were considered employees.  That ordinance requires adherence to the living wage for all county covered contract *employees,* and Plaintiffs purports to sweep themselves under this category by virtue of ZUNI's admission that it adhered to the living wage requirement for all drivers.   Yet Plaintiffs disregard Section 73.0 of

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

the STS Contract which mandates adherence by all providers including ZUNI to the living wage for "Ticket Drivers:"

> Chauffers, who perform service and are compensated on a per trip basis are known as "Ticket Drivers." The CONTRACTOR will monitor the "Ticket Drivers" earnings to ensure that their weekly gross pay is equal to or exceeds the Living Wage for the hours worked during any given week.

There is no admission to be drawn against Defendants, only that ZUNI complied with this STS obligation which expressly applied to "Ticket Drivers" as it did with all other obligations imposed by the County.

Plaintiffs rely on *Solis v. Kansas City Transp. Group,* 2012 WL 3753736 (W.D. Mo. 2012) for support. The only similarities between the cases is that the drivers in that case, like Plaintiffs here, operated routes for a municipality's para-transit route system and bus system. When examining the control factors, it is apparent that unlike this case, the drivers in *Solis* did not exert any controls over the routes, did not have any input in routing assignments or re-routing of passengers, could not reject routes once accepted, reject trips or exercise any flexibility, or discretion in regards to the operation of the routes that could also impact the drivers' profitability. It appears the Defendants in that case did not have any hourly, or employee, drivers who worked as backup drivers, taking on the routes that the claimants might otherwise have rejected, forcing the claimants to complete all routes once accepted. The opinion does not speak of the drivers' discretion over their schedule or time off, whether any drivers were incorporated, or whether they could hire employees or subcontractors of their own, or whether they were exclusively bound to work for Defendants. Nor does the opinion consider to what extent governmental controls and ordinances regulated Defendants' operations and impacted consideration of the manner in which Defendants controlled the drivers' manner of doing the work. In sum, the facts as presented to the court in the Solis case with regards to the control

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

factors, and profitability factor, are distinguishable from the facts presented here, and which are disputed by the parties.

4.      Defendants' Affirmative Defenses: Plaintiffs' Motion fails to overcome or address Defendants' defenses of good faith and lack of willfulness and summary judgment should be denied on these grounds.   Contrary to Plaintiffs' assertion, Defendants do not defend on the grounds of industry custom.   For the same reasons set forth in their Motion for Partial Summary Judgment, Defendants oppose the claim of willfulness and assert their good faith, in part due to their adherence to the long standing custom within the STS program of assigning routes to independent contractors and adherence to the County's Living Wage Ordinance, that being the only known wage regulation that Defendants believed was applicable to the ticket drivers.

## CONCLUSION

For these reasons, Defendants request this Court deny the Plaintiffs' Motion for Summary Judgment in its entirety.

Respectfully submitted,

GRUMER & MACALUSO, P.A.
Attorneys for DEFENDANTS
One East Broward Boulevard, Suite 1501
Fort Lauderdale, Florida 33301
(954) 713-2700
(954) 713-2713 (fax)
Primary Email:        Service@grumerlaw.com
Secondary Emails:     kgrumer@grumerlaw.com
                      slopez@grumerlaw.com

By:    /s/ Keith T. Grumer
          KEITH T. GRUMER
          FLORIDA BAR No.:  550416

GRUMER & MACALUSO, P.A.
ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on 13th day of May, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or vial U.S. Mail for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By: /s/ Keith T. Grumer

GRUMER & MACALUSO, P.A.

ONE EAST BROWARD BOULEVARD, SUITE 1501, FORT LAUDERDALE, FLORIDA 33301 • TELEPHONE (954) 713-2700
PLEADINGS SERVICE E-MAIL: SERVICE@GRUMERLAW.COM